# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION (DAYTON)

| | | |
|---|---|---|
| JOHN H.,[1] | : | Case No. 3:24-cv-00250 |
| Plaintiff, | : | District Judge Thomas M. Rose |
| | : | Magistrate Judge Caroline H. Gentry |
| vs. | : | |
| | : | |
| COMMISSIONER OF THE SOCIAL | : | |
| SECURITY ADMINISTRATION, | : | |
| | : | |
| Defendant. | : | |

## REPORT AND RECOMMENDATION[2]

In March 1993, the Commissioner of the Social Security Administration
("Commissioner") ruled on Plaintiff's application for Supplemental Security Income and
determined that Plaintiff was "disabled" as of November 1, 1992. The Commissioner
conducted continuing disability reviews in 1997, 2001, and 2005 (when Plaintiff turned
age 18) and determined that Plaintiff's disability had continued. The Commissioner
reviewed Plaintiff's claim again in 2016 and found that Plaintiff's disability continued
due to epilepsy and intellectual disability.

The Commissioner subsequently conducted another continuing disability review
and determined that Plaintiff was no longer disabled as of June 11, 2020. That

---

[1] *See* S.D. Ohio General Order 22-01 ("The Committee on Court Administration and Case Management of the Judicial Conference of the United States has recommended that due to significant privacy concerns in social security cases federal courts should refer to claimants only by their first names and last initials.").

[2] *See* 28 U.S.C. § 636(b)(1). The notice at the end of this opinion informs the parties of their ability to file objections to this Report and Recommendation within the specified time period.

determination was upheld upon reconsideration and by a state agency Disability Hearing

Officer. After a hearing at Plaintiff's request, the Administrative Law Judge (ALJ)

concluded that Plaintiff's disability ended on June 11, 2020, and that he had not been

disabled since that time. The Appeals Council denied Plaintiff's request for review.

Plaintiff subsequently filed this action. He seeks an order remanding this matter to

the Commissioner for the award of benefits or, in the alternative, for further proceedings.

The Commissioner asks the Court to affirm the non-disability decision. For the reasons

set forth below, the undersigned Magistrate Judge recommends that the Commissioner's

decision be AFFIRMED.

## I.    BACKGROUND

After an individual is awarded disability benefits, the Commissioner periodically

reviews whether he or she continues to be entitled to disability benefits. *See* 20 C.F.R.

§ 404.1594(a). Among other things, the Commissioner "will compare the current medical

severity of that impairment(s) which was present at the time of the most recent favorable

medical decision that you were disabled or continued to be disabled to the medical

severity of that impairment(s) at that time." 20 C.F.R. § 404.1594(b)(7). The "most recent

favorable medical decision" is referred to as the "comparison point decision" (CPD).

Here, the CPD is the decision dated March 4, 2016. (AR, Doc. No. 7-3 at PageID 89-90.)

The Commissioner began conducting another continuing disability review in

January 2019. (AR, Doc. No. 7-3 at PageID 91.) After the Division of Disability

Determination (DDD) identified "areas of conflict in the medical evidence of record

compar[ed] to [Plaintiff's] presentations and statements regarding his alleged

2

limitations," the DDD referred the matter to the Cooperative Disability Investigations

Unit (CDIU) for an investigation. (AR, Doc. No. 7-6 at PageID 327-38.) CDIU

investigators interviewed Plaintiff at his home, obtained records from the Ohio Bureau of

Motor Vehicles, and reviewed Plaintiff's social media posts before issuing a report on

March 2, 2020 ("CDIU report"). (*Id.*)

After reviewing the CDIU report, a DDD Senior Disability Claims Adjudicator

issued a Special Determination. (AR, Doc. No. 7-3 at PageID 92-95.) The Adjudicator

concluded: "Based on preponderance of evidence, there is reason to believe that

[Plaintiff] knowingly concealed and provided incorrect information concerning his

mental and physical limitations and his ability to function on a daily basis. [Plaintiff] has

committed similar fault in connection with his disability claim." (*Id.* at PageID 95.)

In November 2021, the Commissioner determined that Plaintiff was no longer

disabled as of June 11, 2020. (AR, Doc. No. 7-4 at PageID 146-49.)

SSA's Office of the Inspector General issued a report dated February 4, 2022,

which found that evidence obtained during Plaintiff's appeal had revealed additional

inconsistencies. (AR, Doc. No. 7-7 at PageID 467-519.) Plaintiff's claim was referred to

the Anti-Fraud Unit "to review and comment on the issue of Similar Fault as it may relate

to the current claim." (*Id.* at PageID 470.)

Another Senior Disability Claims Adjudicator issued a Special Determination on

March 8, 2022. (AR, Doc. No. 7-3 at PageID 98-101.) This Adjudicator found that

Plaintiff had "knowingly concealed and provided incorrect information" about his level

of functioning and had "committed similar fault in connection with his disability claim." (*Id.* at PageID 101.)

After a hearing before a Disability Hearing Officer, DDD issued a determination dated August 9, 2022, which affirmed the finding that Plaintiff's disability had medically ceased. (*Id.* at PageID 112.)

Plaintiff was thirty-three years old on the disability cessation date of June 11, 2020. Accordingly, Plaintiff was considered a "younger person" under Social Security Regulations. 20 C.F.R. § 416.963(c). Plaintiff has a "high school education and above." 20 C.F.R. § 406.964(b)(4).

The evidence in the Administrative Record ("AR," Doc. No. 7) is summarized in the ALJ's decision ("Decision," Doc. No. 7-2 at PageID 38-58), Plaintiff's Statement of Errors ("SE," Doc. No. 8), the Commissioner's Memorandum in Opposition ("Mem. In Opp.," Doc. No. 10), and Plaintiff's Reply Memorandum ("Reply," Doc. No. 11). Rather than repeat these summaries, the Court will discuss the pertinent evidence in its analysis below.

## II. LEGAL FRAMEWORK FOR CONTINUING DISABILITY REVIEW DETERMINATIONS

The Social Security Administration provides Supplemental Security Income to individuals who are under a "disability," among other eligibility requirements. *Bowen v. City of New York,* 476 U.S. 467, 470 (1986); *see* 42 U.S.C. §§ 402, 423(a)(1), 1382(a). The term "disability" means "the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can

be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a).

Once an individual has been found disabled, continued entitlement to those benefits depends on whether "there has been any medical improvement in [the individual's] impairment(s) and, if so, whether this medical improvement is related to [the individual's] ability to work." 20 C.F.R. § 416.994(b). "Improvement is measured from 'the most recent favorable decision' that the claimant was disabled." *Kennedy v. Astrue*, 247 F. App'x 761, 764 (6th Cir. 2007) (citing 20 C.F.R. § 416.994(b)(1)(i)).

Significantly, "[t]here is no presumption of continuing disability." *Kennedy*, 247 F. App'x at 764 (citing *Cutlip v. Sec'y of Health & Hum. Servs.*, 25 F.3d 284, 286–287 n.1 (6th Cir. 1994)). Instead, the Commissioner applies a two-part evaluation process.

The first part of the evaluation process considers medical improvement. *Kennedy*, 247 F. App'x at 764. "Medical improvement is any decrease in the medical severity of [the individual's] impairment(s) which was present at the time of the most recent favorable medical decision that [the individual was] disabled or continued to be disabled." 20 C.F.R. § 416.994(b)(1)(i). A determination of medical improvement "must be based on changes (improvement) in the symptoms, signs, or laboratory findings associated with [the individual's] impairment(s)." *Id.* If the severity of the impairments have decreased since the most recent favorable decision, then the medical improvement is related to the individual's ability to work only if there has been a corresponding "increase in [the claimant's] functional capacity to do basic work activities." *Kennedy*, 247 F.

5

App'x at 765 (quoting 20 C.F.R. § 416.994(b)(3)). *See also Nierzwick v. Comm'r of Soc. Sec.*, 7 F. App'x 358, 361 (6th Cir. 2001).

The second part of the evaluation process focuses on whether the individual has the ability to engage in substantial gainful activity. *Kennedy*, 247 F. App'x at 765. The relevant regulations incorporate many of the standards set forth in the regulations that govern initial disability determinations. *Id.* (citing 20 C.F.R. § 416.994(b)(5) and (f)(7)). The major difference is that "the ultimate burden of proof lies with the Commissioner in termination proceedings." *Id.* (citing 20 C.F.R. § 416.994(b)(5) and (f)(7); *Griego v. Sullivan*, 940 F.2d 942, 944 (5th Cir. 1991)). Even if medical improvement is found, the Commissioner "must also show that [the individual is] currently able to engage in substantial gainful activity before [finding] that [the individual is] no longer disabled." 20 C.F.R. § 416.994(b); *see also* 20 C.F.R. § 416.994(b)(1)(v) ("In most instances, we must show that [the individual is] able to engage in substantial gainful activity before [the individual's] benefits are stopped."). Therefore, an increase in the claimant's functional capacity will lead to a cessation of benefits only if the Commissioner shows that, as a result, the claimant can perform his past work or other work that exists in significant numbers in the national economy. 20 C.F.R. § 416.994(b)(5).

## III.  STANDARD OF REVIEW

This Court's review of an ALJ's unfavorable decision is limited to two inquiries: "whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence." *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); *see* 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social

Security as to any fact, if supported by substantial evidence, shall be conclusive."). "Unless the ALJ has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence," this Court must affirm the ALJ's decision. *Emard v. Comm'r of Soc. Sec.*, 953 F.3d 844, 849 (6th Cir. 2020). Thus, the Court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Id*.

"Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains 'sufficien[t] evidence' to support the agency's factual determinations." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (citation omitted). This limited standard of review does not permit the Court to weigh the evidence and decide whether the preponderance of the evidence supports a different conclusion. Instead, the Court is confined to determining whether the ALJ's decision is supported by substantial evidence, which "means—and means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id*. (citation omitted). This standard "presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts." *Mullen v. Bowen,* 800 F.2d 535, 545 (6th Cir. 1986). Thus, the Court may be required to affirm the ALJ's decision even if substantial evidence in the record supports the opposite conclusion. *Key v. Callahan,* 109 F.3d 270, 273 (6th Cir.1997).

The other line of judicial inquiry—reviewing the correctness of the ALJ's legal criteria—may result in reversal even when the record contains substantial evidence supporting the ALJ's factual findings. *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651

7

(6th Cir. 2009). "[E]ven if supported by substantial evidence, 'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Id.* (citations omitted). Such an error of law will require reversal even if "the outcome on remand is unlikely to be different." *Cardew v. Comm'r of Soc. Sec.*, 896 F.3d 742, 746 (6th Cir. 2018) (internal quotations and citations omitted).

## IV. FACTS

### A. The ALJ's Factual Findings

The ALJ was tasked with evaluating the evidence related to whether Plaintiff's disability medically ceased. In doing so, the ALJ considered each of the sequential steps set forth in the Social Security regulations. *See* 20 C.F.R. § 416.994(b)(5). The ALJ made the following findings of fact:

Step 1: At the time of the March 4, 2016 CPD, Plaintiff had the following medically determinable impairments: borderline intellectual functioning and a seizure disorder. Borderline intellectual functioning was found to meet section 12.05C of the Commissioner's Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1.

Since the disability cessation date of June 11, 2020, Plaintiff has had the following medically determinable impairments (the "current impairments"): borderline intellectual functioning, history of seizures, obesity, depression, and anxiety.

Since June 11, 2020, Plaintiff has not had an impairment or combination of impairments which meets or medically equals the severity of an impairment listed in 20 CFR Part 404, Subpart P, Appendix 1.

Step 2: Medical improvement occurred on June 11, 2020.

8

Step 3: The medical improvement is related to the ability to work because by June 11, 2020, Plaintiff's CPD impairments no longer met or medically equaled the same listing that was met at the time of the CPD.

Step 4: The ALJ did not find that any exception to medical improvement applies.

Step 5: Since June 11, 2020, Plaintiff has continued to have a severe impairment or combination of impairments

Step 6: Since June 11, 2020, based on the current impairments, Plaintiff's residual functional capacity (RFC), or the most he can do despite his impairments, *see Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 239 (6th Cir. 2002), has consisted of a full range of work at all exertional levels, subject to the following nonexertional limitations: "(1) frequent climbing of ramps and stairs; (2) no climbing of ladders, ropes, or scaffolds; (3) no work around hazards, such as unprotected heights or dangerous machinery; (4) no driving; (5) simple, routine, repetitive tasks; (6) no fast paced work; (7) no strict production quotas; and (8) limited to work that involves very little, if any, change in the job duties or the work routine from one day to the next."

Plaintiff has no past relevant work.

Step 7: Since June 11, 2020, considering Plaintiff's age, education, work experience, and RFC based on the current impairments, there are jobs that exist in significant numbers in the national economy that he can perform.

(Decision, Doc. No. 7-2 at PageID 42-50.) These findings led the ALJ to conclude that Plaintiff's disability ended on June 11, 2020, and he has not become disabled again since that date. (*Id.* at PageID 50-51.)

## B. State Agency Medical Consultants

State agency medical consultant Esberdado Villanueva, M.D. completed a Physical RFC Assessment form in March 2016, in connection with the CPD evaluation.

9

(AR, Doc. No. 7-8 at PageID 654-61.) Dr. Villanueva opined that Plaintiff had no exertional limitations. (*Id.* at PageID 655.) Dr. Villanueva assessed the following postural and environmental limitations: never climb ladders, ropes, or scaffolds; avoid all exposure to hazards (including no unprotected heights or dangerous machinery); and no commercial driving. (*Id.* at PageID 656-68.) When asked to explain the limitations that he assessed, Dr. Villanueva wrote: "[Primary care physician] notes [history] of seizures and [diagnosis] of epilepsy. No current [treatment] or reports of recent seizures." (*Id.* at PageID 658.)

State agency medical consultant Gary Hinzman, M.D. completed a Medical Evaluation form in June 2020, in connection with the continuing disability review. (AR, Doc. No. 7-8 at PageID 715-16.) For the time period from February 2005 to March 2009, Dr. Hinzman found insufficient evidence to assess Plaintiff's physical condition. (*Id.* at PageID 715.) For the continuing disability review time period, Dr. Hinzman summarized Plaintiff's subjective complaints, medical records, and reported daily activities:

> [Plaintiff] has reported having seizures, which limit his functioning. He reportedly had been taking no medication for this but recently restarted Klonopin according to his Mother. Despite [Plaintiff's] reported seizures, he has been active in wrestling since 2011. [Medical evidence of record] shows no documented seizure activity in [the] last year. Facebook posts and videos show [Plaintiff] taking hits, flying off ropes, taking falls onto a hard ring, jumping[,] and running.

(*Id.*) Based upon this evidence, Dr. Hinzman concluded that "[i]t would appear that the risk for seizures is not imposing any significant limitations on [Plaintiff's] ability to perform hazardous tasks." (AR, Doc. No. 7-8 at PageID 716.) Dr. Hinzman concluded that Plaintiff's physical impairments were no longer severe. (*Id.*) Dr. Hinzman also

10

commented on the CDIU report findings: "Based on [the] preponderance of [the] evidence, there is reason to believe that [Plaintiff] knowingly concealed and provided incorrect information concerning his mental and physical limitations and his ability to function on a daily basis. [Plaintiff] has committed similar fault in connection with his disability claim." (*Id.*)

Steve McKee, M.D. reviewed the updated record and completed a Disability Determination Explanation form in January 2022. (AR, Doc. No. 7-3 at PageID 106-09.) Dr. McKee concluded that Plaintiff's epilepsy was severe. (*Id.* at PageID 106.) Dr. McKee opined that Plaintiff had no exertional limitations but due to a history of seizures was subject to the following nonexertional limitations: never climb ladders, ropes, or scaffolds; avoid all exposure to hazards such as unprotected heights and moving machinery; and no commercial driving. (*Id.* at PageID 108-09.)

With regard to Dr. Hinzman's and Dr. McKee's opinions, the ALJ explained that "Dr. McKee's findings are consistent with the overall evidence and is consistent with the opinion evidence." (Decision, Doc. No. 7-2 at PageID 48.) The ALJ concluded that Dr. "Hinzman's opinion is given some weight, and Dr. McKee's opinion is given great weight." (*Id.*) The ALJ afforded Dr. Villanueva's opinion "great weight" because it was "consistent with the overall evidence, including other opinion evidence and treatment evidence since review (7A)." (*Id.* at PageID 49.)

## C. State Agency Psychological Consultants

State agency psychological consultant David Dietz, Ph.D. reviewed the record and completed Psychiatric Review Technique and Mental RFC Assessment forms in June

2020. (AR, Doc. No. 7-8 at PageID 680-98.) Dr. Dietz found a severe impairment of borderline intellect and opined that Plaintiff experienced moderate impairment in the "B Criteria" areas of understanding, remembering, and applying information and concentration, persistence, or maintaining pace. (*Id.* at PageID 689, 692.) Dr. Dietz found no impairment in Plaintiff's ability to interact with others and to adapt or manage himself. (*Id.* at PageID 692.) In the Mental RFC Assessment form, Dr. Dietz checked boxes to indicate that Plaintiff was moderately limited in the following abilities: understand and remember detailed instructions; carry out detailed instructions; complete a normal workday and workweek without interruptions from psychologically-based symptoms; and perform at a consistent pace without an unreasonable number and length of rest periods. (*Id.* at PageID 695-96.)

Dr. Dietz then summarized the mental health records, Plaintiff's subjective complaints, and the evidence of his daily activities. (AR, Doc. No. 7-8 at PageID 697-98.) Dr. Dietz acknowledged that Plaintiff's IQ scores "over the years" have ranged from 69 to 73 and noted that "[a] majority of the testing scores all fell into the borderline range of functioning." (*Id.* at PageID 698.) Dr. Dietz noted that although Plaintiff "reported he is unable to drive, BMV records show that he did have an active driver's license at one time and additionally had a vehicle registered to him." (*Id.*) Dr. Dietz concluded: "Despite variations in testing and his self-reports, it would appear that his IQ scores and functioning are more consistent with functioning in the borderline level." (*Id.*) Dr. Dietz also concluded that Plaintiff had committed similar fault in connection with his disability

claim. (*Id.* at PageID 698-99.) Dr. Dietz opined that Plaintiff "retain[ed] the ability to complete simple tasks in a work setting." (*Id.* at PageID 698.)

Karla Delcour, Ph.D. reviewed the updated record and completed a Disability Determination Explanation in March 2022 (AR, Doc. No. 7-3 at PageID 102-10.) After summarizing the evidence (*id.* at PageID 104-05), Dr. Delcour affirmed Dr. Dietz's opinion that Plaintiff's borderline intellectual functioning was severe, and he experienced moderate impairment in the "B Criteria" areas of understanding, remembering, and applying information and concentrating, persisting, or maintaining pace. (*Id.* at PageID 106.) Unlike Dr. Dietz, however, Dr. Delcour also concluded that Plaintiff had non-severe mental impairments of depressive and anxiety disorders and found mild (versus no) impairment in the "B Criteria" areas of interacting with others and adapting or managing oneself. (*Id.*)

In the Symptoms Evaluation section of the form, Dr. Delcour stated that Plaintiff's reported symptoms were "[p]artially consistent" with the "total medical and non-medical evidence" of record. (AR, Doc. No. 7-3 at PageID 107.) Referring to the CDIU fraud investigation and Special Determination of similar fault, she stated that Plaintiff's "statements are not felt to be consistent with the objective file evidence." (*Id.*) Dr. Delcour also addressed the medical opinion of consultative psychologist John Reece, Psy.D. and concluded that it was "more restrictive than the findings." (*Id.* at PageID 108.) Dr. Delcour explained that Dr. Reece's conclusions "are based on [Plaintiff's] report which has been found to be inconsistent with objective evidence. . . . The opinion relies heavily on the subjective report of symptoms and limitations provided by the individual,

13

and the totality of the evidence does not support the opinion." (*Id.*) In the mental RFC section of the form, Dr. Delcour affirmed Dr. Dietz's opinion that Plaintiff "retain[ed] the ability to complete simple tasks in a work setting." (*Id.* at PageID 109-10.)

The ALJ assigned little weight to Dr. Dietz's opinion and some weight to Dr. Delcour's opinion. (Decision, Doc. No. 7-2 at PageID 48.) The ALJ explained that Dr. Dietz's findings were "minimally consistent with the overall evidence, as he dismissed [Plaintiff's] allegations solely due to his wrestling career." (*Id.*) The ALJ further explained that Dr. Delcour's findings were "more consistent with the overall evidence." (*Id.*) Additionally, the ALJ reasoned that "construing the evidence in a light more favorable to the claimant, the evidence warrants a limitation to work pace." (*Id.*)

### D. Consultative Psychologist James Rosenthal, Psy.D.

James Rosenthal, Psy.D. performed a consultative psychological evaluation in June 2019. (AR, Doc. No. 7-8 at PageID 672-75.) Dr. Rosenthal diagnosed an unspecified depressive disorder and a panic disorder. (*Id.* at PageID 674.) Dr. Rosenthal noted Plaintiff's prognosis as "good," explaining that Plaintiff "said his medication treatment has helped to manage his psychological symptoms of panic and depression." (*Id.*) Regarding the ability to manage funds, Dr. Rosenthal wrote: "[Plaintiff] said he can read and write. He appears to be of low average intellect. He appears to have adequate cognitive skills to understand how to use a check or money order to pay a bill." (*Id.*)

In the "Functional Discussion of Four Work-Related Abilities" section of the report, Dr. Rosenthal recited Plaintiff's subjective reports and his documented findings from the evaluation. (AR, Doc. No. 7-8 at PageID 675.) When asked to describe

14

Plaintiff's abilities and limitations in understanding, remembering, and completing

directions, Dr. Rosenthal wrote: "[Plaintiff] was alert. He was on task. He was able to

follow and understand interview questions and directions. He appears to be of low

average intellect. He was able to understand and complete interview questions. He did

not ask to have directions explained or repeated." (AR, Doc. No. 7-8 at PageID 675.) In

the area of maintaining attention, concentration, persistence, and pace to perform simple

and multi-step tasks, Dr. Rosenthal wrote:

> [Plaintiff] did not appear anxious, restless[,] or overly distracted during the
> exam. He made limited eye contact. He said he watches television
> regularly. He said he was treated for attention problems when he was in
> elementary school. He takes medicine for depression and anxiety currently.
> He does not drive. He uses a computer daily to access the Internet. He does
> not read regularly. He said he attends appointments as scheduled.

(*Id.*) As for responding appropriately to supervision and coworkers, Dr. Rosenthal stated:

> [Plaintiff] said he is not aggressive or violent. He relates well with his
> mother, stepfather, and girlfriend. He sees his daughter every other
> weekend. He has no history of anger management problems. He was
> cooperative during the exam. He sees a couple of friends monthly. He does
> not belong to groups or clubs.

(Decision, Doc. No. 7-8 at PageID 675.) In the final area of responding appropriately to

work pressures, Dr. Rosenthal wrote:

> [Plaintiff] was never removed from a job because work stress was
> excessive. He never took a medical leave because he couldn't tolerate work
> pressure. He reported ongoing problems with depression mainly. He said he
> lacks energy and motivation to complete tasks. He copes with life stress by
> restricting social activities, taking medication, taking a walk, and attending
> therapy sessions.

(*Id.*)

15

The ALJ afforded great weight to Dr. Rosenthal's opinion. (Decision, Doc. No. 7-2 at PageID 48.) The ALJ stated that Dr. Rosenthal's findings were "generally consistent with the overall evidence, which indicates that [Plaintiff] has less than moderate limitations in any mental health area, and no limitations in social interaction." (*Id.*) The ALJ found that Dr. Rosenthal's examination findings and conclusions were "generally consistent with other consultative examination evidence." (*Id.*) Additionally, the ALJ noted: "[Plaintiff] told Dr. Rosenthal that he is able to use a computer to access the internet, which is not fully consistent with [Plaintiff's] allegation of debilitating intellectual disability." (*Id.*)

### E.    Consultative Psychologist John Reece, Psy.D.

John Reece, Psy.D. performed a consultative psychological evaluation in January 2021. (AR, Doc. No. 7-8 at PageID 718-24.) Dr. Reece diagnosed an unspecified depressive disorder, an unspecified anxiety disorder, and an unspecified trauma and stressor-related disorder with dependent personality traits. (*Id.* at PageID 723.) In the "Summary" section of the report, Dr. Reece opined that Plaintiff's mental symptoms "have had a mild effect on his history and behavior in the areas of stress tolerance and comprehending/retaining instructions." (*Id.*) Dr. Reece noted: "[Plaintiff] cites mental illness symptoms as the reason for his current inability to work. [Plaintiff's] level of intellectual functioning was not established in this examination; there are indications from his history and presentation supporting an impression of a lower level of intellectual functioning." (*Id.*) Regarding Plaintiff's ability to manage funds, Dr. Reece stated: "[Plaintiff] is assessed as being unable to manage finances, per his report." (*Id.*)

16

In the "Functional Assessment" section, Dr. Reece documented his examination findings and Plaintiff's subjective reports. (AR, Doc. No. 7-8 at PageID 723-23.) When asked to describe Plaintiff's limitations in understanding, remembering, and carrying out instructions, Dr. Reece wrote: "[Plaintiff] was able to follow directions in the exam. Probable borderline intellectual functioning was assessed. He reported that he was slow to comprehend instructions in his minimal work history, for a brief duration, in the remote past." (*Id.* at PageID 723.) With regard to Plaintiff's ability to maintain attention, concentration, persistence, and pace to perform simple and multi-step tasks, Dr. Reece noted that Plaintiff "had no difficulty with concentration" during the evaluation. (*Id.* at PageID 724.) Regarding Plaintiff's ability to respond appropriately to supervision and coworkers, Dr. Reece wrote: "[Plaintiff] reported a history of sustained and satisfying relationships. He reported dependent personality factors. He reported no problems with co-workers, but conflicts with supervisors in the past workplace." (*Id.*) In the final area of responding to work pressures, Dr. Reece wrote: "[Plaintiff] reported having social supports. He reported no problems in the past workplace. Current deficits in dealing with stress and pressure in the workplace are anxiety and depression." (*Id.*)

The ALJ gave great weight to Dr. Reece's findings. (Decision, Doc. No. 7-2 at PageID 48.) The ALJ cited several findings from Dr. Reece's report, such as the fact that Plaintiff "told Dr. Reece that he is able to care for his infant son and that he does household chores and prepares food throughout the day." (*Id.*) The ALJ also noted Dr. Reece's observations that Plaintiff "was able to comprehend instructions during the exam and he had no difficulty with concentration and attention. Some deficits were noted in

stress tolerance." (*Id.*) The ALJ found Dr. Reece's opinion to be "mostly consistent with the overall evidence, including other consultative examination evidence (15F)." (*Id.* (citing Dr. Rosenthal's report, AR, Doc. No. 7-8 at PageID 672-75).)

> **F.    Consultative Psychologist Stephen Halmi, Psy.D.**

Dr. Halmi performed a consultative psychological evaluation in February 2016, in connection with the most recent favorable determination (the CPD). (AR, Doc. No. 7-8 at PageID 637-43.) Dr. Halmi diagnosed an unspecified bipolar and related disorder and an unspecified anxiety disorder. (*Id.* at PageID 642.) He "ruled out" both "[a] specific Learning Disorder and Borderline Intellectual Functioning." (*Id.*) Regarding Plaintiff's ability to manage funds, Dr. Halmi recommended that he "be assigned a payee given his self-report that he has a learning disability and has difficulty managing money." (*Id.*)

In the Functional Assessment section of the report, Dr. Halmi addressed Plaintiff's ability to understand, remember, and carry out instructions:

> [Plaintiff] reported having a learning disability. He said he participated in special education classes throughout his formal schooling, but he also said that he earned his high school diploma. Moreover, he said that he has worked as an usher in a move theatre and performs odd jobs for others to earn money. During this evaluation, he understood and follow[ed] simple instructions, but struggled to complete tasks that required multiple steps.

(AR, Doc. No. 7-8 at PageID 642.) Regarding Plaintiff's ability to maintain attention, concentration, persistence, and pace to perform simple and multi-step tasks, Dr. Halmi wrote:

> [Plaintiff] reported having poor concentration, but said that his energy level is good. He said he is able to complete household chores, but is easily distracted. As aforementioned, he said that he had a job for a year as an usher and denied having any problems performing his job duties. Also, as

18

aforementioned, he said that he is able to complete odd jobs such as raking leaves, shoveling snow, and denied any problems performing these tasks. He maintained adequate attention and concentration to complete this evaluation. He was able to perform tasks that required attention, but struggled on tasks that requiring [sic] concentration and working memory.

(*Id.* at PageID 643.) As for Plaintiff's ability to respond appropriately to supervision and coworkers, Dr. Halmi wrote:

[Plaintiff] reported that he had some problems getting along with classmates or teachers, but did not provide specifics. Presently, he denied having any problems getting along with peers, coworkers, or the general public. He was cordial and cooperative during this evaluation. He said he has some social anxiety, but gave no indication that it negatively affects his interaction with others.

(AR, Doc. No. 7-8 at PageID 643.) In the final area of responding to work pressures, Dr. Halmi wrote:

Typical daily work stressors include the ability to manage difficult people, meet deadlines, accept constructive criticism, and solve unforeseen novel problems. Based on this evaluation, it is my opinion that he would likely have difficulty managing problematic people because of his intellectual abilities and his anxiety. He appears capable of meeting deadlines if the task is simple and repetitive. He also appears as if he would respond appropriately to constructive criticism. Moreover, he appears capable of solving unforeseen, novel problems as long as the solutions to those problems do not surpass his intellectual abilities.

(*Id.*)

The ALJ gave "only some weight" to Dr. Halmi's assessment. (Decision, Doc. No. 7-2 at PageID 49.) The ALJ acknowledged that Dr. Halmi's findings were "consistent with a finding of no more than moderate limitations in any mental health area." (*Id.*) However the ALJ reasoned that "the record contain[ed] more recent consultative examination evidence consistent with more recent treatment notes (15F; 21F)." (*Id.*

19

(citing Dr. Rosenthal's report, AR, Doc. No. 7-8 at PageID 672-75; Dr. Reece's report, AR, Doc. No. 7-8 at PageID 718-24).)

## V.     LAW AND ANALYSIS

Plaintiff asserts one error: "[T]he ALJ reversibly erred by failing to properly evaluate the prior administrative medical findings of the state agency reviewers and the medical opinions for supportability as required by 20 C.F.R. § 416.920c." (SE, Doc. No. 8 at PageID 1314.) For the reasons discussed below, Plaintiff's asserted error is not well-taken and the undersigned recommends that the ALJ's decision be affirmed.

### A.     Applicable Regulations for Medical Opinion Evidence

As an initial matter, the Court must decide which regulations apply to the medical opinion evidence submitted for review.

In his Statement of Errors, Plaintiff argues that the ALJ should have evaluated the medical opinion evidence under the regulations applicable to claims filed after March 27, 2017. (*E.g.,* SE, Doc. No. 8, PageID 1314.) Plaintiff argues that the ALJ "failed to evaluate the medical source opinions and all of the prior administrative medical findings in the record pursuant to the two—not one—most important factors" of supportability and consistency. (*Id.* at PageID 1321 (citing, generally, 20 C.F.R. § 416.920c(c)(a) – (c)).) According to Plaintiff, the ALJ failed to articulate how he considered these factors as is now required by 20 C.F.R. § 416.920c(b). (*Id.* at PageID 1323.)

Defendant disagrees and argues that the prior regulations for evaluating medical opinion evidence apply. (Mem. In Opp., Doc. No. 10 at PageID 1338-39.) Defendant reasons that because the CPD was issued prior to March 27, 2017, the requirements of 20

20

C.F.R. § 416.927 apply. (*Id.* (citing SSA's Hearing, Appeals, and Litigation Law Manual (HALLEX) I-5-3-30, Revisions to the Rules Regarding the Evaluation of Medical Evidence (S.S.A. April 15, 2017) (last updated Aug. 25, 2021); SSA's Program Operations Manual System (POMS) DI 24503.050(D)(7), Determining the Filing Date for Evaluating Evidence (S.S.A., last updated July 24, 2024)).) Defendant contends that the ALJ properly applied the prior regulations for evaluating medical opinion evidence. (*Id.* at PageID 1339-43.)

In his Reply (Doc. No. 11), Plaintiff does not dispute Defendant's contention that the prior regulations for evaluating medical opinion evidence apply. Instead, Plaintiff argues that the prior regulations also required the ALJ to evaluate the medical opinions for supportability, and that the ALJ did not do so. (*Id.* at PageID 1345-47.)

The undersigned finds that the prior regulations for evaluating medical opinion evidence apply in this case. As Defendant notes, SSA's HALLEX[3] provides guidance to ALJs on which medical opinion evidence regulations to apply in continuing disability reviews. *See* HALLEX I-5-3-30; *see also* POMS DI 24503.050(D)(7). The undersigned recognizes that "[a]lthough the HALLEX manual provides procedural guidance for agency adjudicators, it is not legally binding." *Dawn M. v. Comm'r of Soc. Sec.*, No. 3:24-cv-02, 2024 U.S. Dist. LEXIS 133382, *12 (S.D. Ohio July 29, 2024) (Bowman, M.J.), *aff'd Mabry-Schlicher v. Comm'r of Soc. Sec.*, 2025 U.S. App. LEXIS 14028 (6th

---

[3] The Sixth Circuit has recognized that the HALLEX provides "'guiding principles, procedural guidance and information' to adjudicators and staff of the Office of Hearings and Appeals." *Bowie v. Comm'r of Soc. Sec.*, 2008 U.S. App. LEXIS 23712, *6 (6th Cir. Nov. 5, 2008) (citing HALLEX I-1-0-1, 2005 WL 1863821 (S.S.A. June 21, 2005)).

Cir. June 6, 2025). Nevertheless, the undersigned finds HALLEX to provide persuasive authority in this circumstance.

HALLEX generally provides that "[t]he same rules apply throughout the entire CDR determination or decision, including the appeals process." HALLEX I-5-3-30(IV)(E). More specifically, HALLEX directs the ALJ to "[u]se the prior rules if the comparison point decision (CPD) is dated before March 27, 2017." HALLEX I-5-3-30(IV)(E)(1). Further:

> If the individual's disability has medically ceased, the determination or decision must also address the individual's eligibility (or ineligibility) for a new period of disability through the date on which the appeal determination or decision is being made.

> If the initial request for review of the disability cessation determination was:

>> • Before March 27, 2017, use the prior rules to evaluate the new period of disability.

>> • On or after March 27, 2017 and the prior rules were used when finding medical cessation, use the prior rules to evaluate the new period of disability.

>> • On or after March 27, 2017 and the current rules were used when finding medical cessation, use the current rules to evaluate the new period of disability.

HALLEX I-5-3-30(IV)(E)(3).

Here, there was a prior continuing disability review and the CPD is dated March 4, 2016. The Adjudicators therefore used the prior rules when determining that Plaintiff's disability medically ceased. HALLEX I-5-3-30(IV)(E)(1). Because the cessation determination was dated June 11, 2020 (AR, Doc. No. 7-3 at PageID 97), Plaintiff

22

requested review of it after March 27, 2017. Accordingly, the prior rules apply to address Plaintiff's disability through the date of the ALJ decision. HALLEX I-5-3-30(IV)(E)(3).

### B.    Applicable Law

Under the prior opinion evidence rules in 20 C.F.R. § 404.1527, the ALJ must consider and evaluate every medical opinion in the record. *See* 20 C.F.R. § 404.1527(b), (c). However, "greater deference is generally given to the opinions of treating physicians than to those of non-treating physicians, commonly known as the treating physician rule." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242 (6th Cir. 2007) (citations omitted). Under the treating physician rule, "[t]reating-source opinions[4] must be given 'controlling weight' if two conditions are met: (1) the opinion 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques'; and (2) the opinion 'is not inconsistent with the other substantial evidence in [the] case record.'" *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013) (quoting in part 20 C.F.R. § 404.1527(c)(2)); *see Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 723 (6th Cir. 2014).

"If the ALJ declines to give a treating source's opinion controlling weight, he must then balance the following factors to determine what weight to give it: 'the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and specialization of the treating source.'" *Cole v. Astrue*, 661 F.3d

---

[4] A "treating source" is a claimant's "own acceptable medical source who provides . . . medical treatment or evaluation and who has . . . an ongoing treatment relationship" with a claimant. 20 C.F.R. § 404.1527(a)(1).

931, 937 (6th Cir. 2011) (quoting *Wilson v. Comm'r of Soc. Sec,* 378 F.3d 541, 544 (6th

Cir. 2004)). An ALJ's failure to balance these factors and assign a specific weight "alone

constitutes error, as 'a finding that a treating source medical opinion . . . is not entitled to

controlling weight [does] not [mean] that the opinion should be rejected." *Cole*, 661 F.3d

at 938 (quoting *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 408 (6th Cir. 2009)).

 "Separate from the treating physician rule, but closely related, is the requirement

that the ALJ 'always give good reasons' for the weight ascribed to a treating-source

opinion." *Hargett v. Comm'r of Soc. Sec.*, 964 F.3d 546, 552 (6th Cir. 2020) (citing 20

C.F.R. § 404.1527(c)(2); other citation omitted)); *see Wilson*, 378 F.3d at 544. "Those

good reasons must be 'supported by the evidence in the case record, and must be

sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator

gave to the treating source's medical opinion and the reasons for that weight.'" *Cole*, 661

F.3d at 937 (quoting SSR 96-2p, 1996 SSR LEXIS 9, at *12 (July 2, 1996)).[5] For

example, "an ALJ may not summarily discount a treating-source opinion as not well-

supported by objective findings or being inconsistent with the record without identifying

and explaining how the substantial evidence is purportedly inconsistent with the treating-

source opinion." *Hargett*, 964 F.3d at 552.

 The Sixth Circuit has explained that "[t]he point of the 'good reasons' rule is to

permit meaningful review of the ALJ's decision and to ensure that a claimant is not

---

[5] SSR 96-2p has been rescinded. However, this rescission is effective only for claims filed on or after
March 27, 2017. See SSR 96-2p, 2017 WL 3928298 at *1. Because Plaintiff filed his application for
benefits prior to March 27, 2017, SSR 96-2p still applies in this case.

'bewildered' when an administrative bureaucracy tells him that he is not disabled."

*Biestek v. Comm'r of Soc. Sec.*, 880 F.3d 778, 786 (6th Cir. 2017) (citations omitted).

Given the importance of this rationale, a violation of the good reasons rule will "denote a

lack of substantial evidence" that justifies reversal unless the error is harmless:[6]

> Because of the significance of the notice requirement in ensuring that each
> denied claimant receives fair process, a failure to follow the procedural
> requirement of identifying the reasons for discounting the opinions and for
> explaining precisely how those reasons affected the weight accorded the
> opinions denotes a lack of substantial evidence, even where the conclusion
> of the ALJ may be justified based upon the record.

*Rogers*, 486 F.3d at 243. Courts in the Sixth Circuit therefore "do not hesitate to remand

when the Commissioner has not provided 'good reasons' for the weight given to a

treating physician's opinion." *Wilson*, 378 F.3d at 545.

For medical opinions from sources that are not "treating sources" as defined in 20

C.F.R. § 416.967(a)(1), the ALJ must consider several factors, including the examining

relationship, treatment relationship, supportability, consistency, and specialization. 20

C.F.R. § 416.927(c). The ALJ must consider the same factors when evaluating opinions

from medical sources who are not "acceptable medical sources" and from nonmedical

sources, although "not every factor for weighing opinion evidence will apply in every

case." 20 C.F.R. § 416.927(f)(1). The ALJ "generally should explain the weight given to

opinions from these sources or otherwise ensure that the discussion of the evidence . . .

---

[6] "[A] failure to give good reasons could constitute harmless error . . . where 'a treating source's opinion
is so patently deficient that the Commissioner could not possibly credit it,' or where the Commissioner
made 'findings consistent with the [treating-source] opinion' or where the purposes of notice and ability
for meaningful review have been satisfied." *Hargett*, 964 F.3d at 554 (quoting *Wilson*, 378 F.3d at 547).

allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case." 20 C.F.R. § 416.927(f)(2).

### C. The ALJ Did Not Reversibly Err In His Analysis Of The Medical Opinions And Prior Administrative Medical Findings

Because they acted as one-time consultative psychologists, Drs. Rosenthal, Reece, and Halmi are not "treating sources" under 20 C.F.R. § 416.927(a)(1), and their opinions are not entitled to controlling or deferential weight. 20 C.F.R. § 416.927(c)(2). Likewise, Drs. Villanueva, Hinzman, McKee, Dietz, and Delcour, who reviewed the record without examining Plaintiff, are not "treating sources" and their opinions are not entitled to controlling or deferential weight. 20 C.F.R. § 416.927(a)(1), (c)(2). Nevertheless, they are all licensed physicians or psychologists and so are "acceptable medical sources." 20 C.F.R. § 416.902(a). While the ALJ is not required to articulate "good reasons" for rejecting an opinion from an "acceptable medical source" who is not a "treating source," the regulations still require the ALJ to consider such an opinion using the factors in 20 C.F.R. § 416.927(c).

Plaintiff's sole assignment of error is "[w]hether the ALJ reversibly erred by failing to properly evaluate the prior administrative medical findings of the stage agency reviewers and the medical opinions for supportability . . . ." (SE, Doc. No. 8 at PageID 1314; Reply, Doc. No. 11 at PageID 1346-47).[7] For the reasons set forth below, the undersigned finds that the ALJ adequately addressed the supportability factor with

---

[7] Because Plaintiff does not argue that the ALJ's conclusions are unsupported by substantial evidence (*see generally* SE, Doc. No. 8; Reply, Doc. No. 11), the undersigned will not address that issue.

respect to these medical opinions and prior administrative medical findings and therefore recommends that the Commissioner's decision be affirmed.[8]

### 1. State agency medical consultants

With respect to the opinions of the state agency medical consultants, the ALJ assigned some weight to Dr. Hinzman's opinions and great weight to the opinions of Dr. Villanueva and Dr. McKee. The undersigned concludes that the ALJ adequately analyzed the supportability factor under 20 C.F.R. § 416.927(c) with respect to these opinions.

Both Dr. Villanueva and Dr. McKee opined that Plaintiff had no exertional limitations but should be limited to no climbing of ladders, ropes, or scaffolds; no exposure to hazards (including unprotected heights and dangerous machinery); and no commercial driving. (*See* AR, Doc. No. 7-8 at PageID 655-58 (Dr. Villanueva); AR, Doc. No. 7-3 at PageID 106-09 (Dr. McKee)). Both consultants cited Plaintiff's history of seizures, and Dr. Villanueva further noted that the records showed no current treatment for seizures or reports of recent seizures. (*Id.*)

The ALJ gave "great weight" to these consultants' opinions and included their proposed limitations in the RFC. (Decision, Doc. No. 7-2 at PageID 45). The ALJ also reviewed the evidence that supported these opinions. For example, the ALJ explained that

---

[8] The ALJ discussed much of the evidence at Step Three (Finding Number 4) and in the medical evidence discussion of the RFC analysis. (*See* Decision, Doc. No. 7-2 at PageID 43-44, 46-48.) This Court is permitted to consider the ALJ's evaluation of the evidence at other steps of the decision to determine how to "credit the evidence at issue in this appeal." *See, e.g., Bledsoe v. Barnhart*, 165 F. App'x 408, 411 (6th Cir. 2006); *Smith-Johnson v. Comm'r of Soc. Sec.*, 579 F. App'x. 426, 435 (6th Cir. 2014); *Forrest v. Comm'r of Soc. Sec.*, 591 F. App'x 359, 365-66 (6th Cir. 2014); *Crum v. Comm'r of Soc. Sec.*, 660 F. App'x 449, 457 (6th Cir. 2016). Accordingly, this Court will consider the ALJ's evaluation of Plaintiff's impairments in Step Three and the RFC analysis when evaluating Plaintiff's assignment of error.

electroencephalogram testing in 2021 that showed no evidence of epileptiform abnormalities or electrographic seizures. (Decision, Doc. No. 7-2 at PageID 46 (citing AR, Doc. No. 7-9 at PageID 902).) The ALJ also noted Plaintiff's report that he had "been able to participate in organized wrestling, including in front of crowds, lights, and sounds, where he was the center of attention," and his May 2023 testimony that he had not had a seizure "for a couple of years." (*Id.* (citing AR, Doc. No. 7-2 at PageID 68; AR, Doc. No. 7-6 at PageID 326-445; AR, Doc. No. 7-7 at PageID 467-519).) The ALJ concluded that Plaintiff's history of a seizure disorder was "well controlled" but explained that because of Plaintiff's seizure history, the RFC limited Plaintiff to exposure to certain hazards. (*Id.*) The undersigned finds that the ALJ adequately analyzed the supportability of these consultants' opinions.

Dr. Hinzman similarly noted that Plaintiff had not been taking medication for seizures and that there were no documented seizures within the last year. (AR, Doc. No. 7-8 at PageID 715.) However, Dr. Hinzman relied heavily on evidence of Plaintiff's involvement in wrestling to conclude that his physical impairments were no longer severe and that "the risk for seizures is not imposing any significant limitations on [Plaintiff's] ability to perform hazardous tasks." (AR, Doc. No. 7-8 at PageID 716.) The ALJ gave Dr. Hinzman's opinions only "some weight" and explained elsewhere in the Decision: "[B]ecause the claimant has a history of reported seizure disorder and obesity, the evidence indicates that some limitation to hazards, such as heights and machinery is warranted." (Decision, Doc. No. 7-2 at PageID 46). The undersigned also finds that the ALJ adequately analyzed the supportability of Dr. Hinzman's opinions.

###### 2. State agency psychological consultants

The ALJ also adequately analyzed the supportability factor when he decided to give little weight to Dr. Dietz's opinion and some weight to Dr. Delcour's opinion.

As summarized by the ALJ, both Dr. Dietz and Dr. Delcour opined that Plaintiff "has moderate limitations in understanding, remembering, or applying information, and in concentration, persistence, or pace . . . ." (Decision, Doc. No. 7-2 at PageID 48.) Although Dr. Dietz also opined that Plaintiff had no limitation in any other areas, the ALJ found this opinion only "minimally consistent with the overall evidence" and noted that Dr. Dietz had "dismissed the [Plaintiff's] allegations solely due to his wrestling career." (*Id.*) He therefore gave Dr. Dietz's opinion little weight. (*Id.*) Observing that Dr. Delcour had found mild limitations in other areas (i.e., depressive and anxiety disorders), the ALJ concluded that her findings "were more consistent with the overall evidence" and gave her opinions "some weight." (*Id.*) The ALJ accounted for these consultants' opinions by including a limitation in the RFC for "no fast paced work." (*Id*. at 45, 48).

Based upon the ALJ's review of the relevant evidence elsewhere in the Decision, the undersigned concludes that he adequately analyzed the supportability of Dr. Dietz's and Dr. Delcour's opinions. The ALJ acknowledged many of Plaintiff's subjective complaints, which included anxiety, depression, suicidal ideation, cognitive issues, difficulty reading, difficulty counting and managing money, being "scared of people," and never managing money or living independently. (Decision, Doc. No. 7-2 at PageID 44, 46.) The ALJ also summarized medical records that documented Plaintiff's treatment for his mental impairments, which included counseling and psychotropic medication. (*Id.*

at PageID 43-44, 46-48.) He acknowledged that "several sets of IQ scores . . . bring [Plaintiff's] level of intelligence within the scope of Listing 12.05 (1F/34; 3F/8)." (*Id.* at PageID 46.) The ALJ also acknowledged many of the abnormal findings in the mental health treatment notes, such as a slightly slowed to slowed pace of problem solving. (*Id.* at PageID 43-44, 46-48.) The ALJ's review of the evidence shows that he adequately analyzed the supportability of these consultants' opinions in connection with deciding to give them either some (Dr. Delcour) or little (Dr. Dietz) weight.

### 3. Consultative psychologists

Finally, the undersigned finds that the ALJ adequately analyzed the supportability of the opinions of consultative psychologists Dr. Halmi, Dr. Rosenthal, and Dr. Reece.

The ALJ noted that in 2016, Dr. Halmi had examined Plaintiff and diagnosed an unspecified anxiety disorder and an unspecified bipolar disorder. (Decision, Doc. No. 7-2 at PageID 49.) Dr. Halmi did not find greater than moderate limitations in any mental health area. (*Id.*) The ALJ concluded that because the record contained more recent consultative examination evidence—which evidence was consistent with recent treatment notes—he would only give Dr. Halmi's opinion some weight. (*Id.*) This explanation adequately analyzes the supportability factor.

The ALJ explained that in 2019, Dr. Rosenthal diagnosed Plaintiff with depression and a panic disorder, did not identify moderate or greater limitations in any mental health area, and identified no limitations in social interaction. (Decision, Doc. No. 7-2 at PageID 48). The ALJ found that Plaintiff's statement to Dr. Rosenthal that he used a computer to access the internet "is not fully consistent with the claimant's allegation of

debilitating intellectual disability." (*Id.*) The ALJ also concluded that Dr. Rosenthal's findings "are generally consistent with the overall evidence," including other consultative examination findings, and gave his opinion "great weight." (*Id.*)

The ALJ's analysis of Dr. Rosenthal's opinion complied with the requirement to consider the supportability of that opinion. For example, when analyzing Plaintiff's statement regarding the use of a computer to access the internet, the ALJ concluded that "the extent to which [Plaintiff] describes the wrestling activity on the internet as well as other remarks in [his] internet posts show a level of cognitive functioning well above Listing level, and consistent with at least borderline intellectual functioning." (Decision, Doc. No. 7-2 at PageID 47.) The ALJ found that "while [Plaintiff's] fledgling wrestling career does not seriously undermine his claims of some cognitive limitation, it does cast grave doubt upon his allegations of disabling and debilitating level anxiety and social deficits." (*Id.*) And the ALJ reviewed numerous records before concluding that Plaintiff "plainly has sufficient cognitive development to understand, remember, and carry out simple instructions, and has sufficient persistence and concentration to maintain a competitive pace of work." (*Id.*) The ALJ's analysis adequately analyzed supportability.

The ALJ also noted that in 2021, Dr. Reece diagnosed Plaintiff with depression, anxiety, and an unspecified trauma and stress disorder. (Decision, Doc. No. 7-2 at PageID 48). Dr. Reece found that Plaintiff "was able to comprehend instructions during the exam and he had no difficult with concentration and attention" although "[s]ome deficits were noted in stress tolerance." (*Id.*) Plaintiff also told Dr. Reece that he can care for his infant son, do household chores, and prepare meals. (*Id.*) The ALJ similarly concluded that Dr.

31

Reece's opinion "is mostly consistent with the overall evidence, including other consultative examination evidence," and therefore gave his opinion "great weight." (*Id.*)

The undersigned finds that the ALJ adequately analyzed the supportability of Dr. Reece's opinion. For example, at Step 3 and in the medical evidence discussion of the RFC analysis, the ALJ cited several findings from Dr. Reece's evaluation, such as satisfactory concentration, satisfactory task persistence, and adequate to fair insight. (Decision, Doc. No. 7-2 at PageID 44 (citing AR, Doc. No. 7-8 at PageID 723).) The ALJ also noted that although Plaintiff told Dr. Reece that he had never managed his finances or lived independently, Dr. Reece concluded that Plaintiff appeared "able to make important decisions about his future and seek appropriate community resources." (*Id.*)

In summary, the undersigned concludes that the ALJ adequately analyzed the supportability factor with respect to all of the opinions and findings of the state agency consultants and consultative psychologists.

## VI.    CONCLUSION

The ALJ's explanations for why he afforded certain weight to the medical opinions and administrative findings are sufficient for the Court to track his reasoning, and that is all that the regulations require. 42 U.S.C. § 405(g); *Rogers*, 486 F.3d at 241; *Hargett*, 964 F.3d at 552. The undersigned finds that the ALJ adequately analyzed the supportability factor with respect to the medical opinions and prior administrative medical findings. Therefore, the undersigned recommends that the ALJ's decision be affirmed.

**IT IS THEREFORE RECOMMENDED THAT**:

     1.     Plaintiff's Statement of Errors (Doc. No. 8) be OVERRULED;

     2.     The Court AFFIRM the Commissioner's non-disability determination; and

     3.     The case be terminated on the Court's docket.

*s/ Caroline H. Gentry*
Caroline H. Gentry
United States Magistrate Judge

## NOTICE REGARDING OBJECTIONS

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within **FOURTEEN** days after being served with this Report and Recommendations. Pursuant to Fed. R. Civ. P. 6(d), this period is extended to **SEVENTEEN** days if this Report is being served by one of the methods of service listed in Fed. R. Civ. P. 5(b)(2)(C), (D), or (F). Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. A party may respond to another party's objections within **FOURTEEN** days after being served with a copy thereof.

Failure to make objections in accordance with this procedure may forfeit rights on appeal.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947, 949-50 (6th Cir. 1981).